AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iCloud, 1 Apple Park Way, Cupertino, CA 95014 re.<br>the iCloud account affiliated with<br>gohardmafia@icloud.com and/or cxxxddd89@gmail.com | )<br>)<br>)<br>)<br>)<br>)<br>) Case No.  '21 MJ01719 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1591 | Sex Trafficking of a Minor |

The application is based on these facts:

See Attached Affidavit of HSI Special Agent Aron C. Marcellus

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Aron C. Marcellus, HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 04/30/2021 _____

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Barbara L. Major, United States Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT

I, Aron C. Marcellus, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereinafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with Apple iCloud account connected to **gohardmafia@icloud.com** and/or **cxxxddd89@gmail.com** (hereinafter the "**Subject Account**") that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Apple Park Way, Cupertino, California 95014. The information to be disclosed by Apple and searched and seized by the government pertaining to violations of Title 18, United States Code, Sections 1591 as described in the following paragraphs and in Attachments A and B, which are attached hereto and incorporated herein.

2. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Subject Account**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

3. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

4.      I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity. I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations.  These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes and bulk cash smuggling.

5.      Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

6.      Since October 2019, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

7.      My experience as an HSI Special Agent has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures,

computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

8. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a. Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b. Individuals involved in illicit commercial sex often solicit clients through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers;

c. Individuals involved in illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

d. Individuals involved in illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

e. Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

f. Individuals involved in illicit commercial sex use cellular telephones, tablet, desktop, removal hard drives and flash drives, and notebook computers and maintain these items on their person and/or in their residences and/or vehicles. Individuals involved in illicit commercial sex use cellular telephones, tablet, notebook computers, and removable storage media to increase their mobility, coordinate illicit activities, and to provide pimps and prostitutes with instant access to phone calls, voice messages, text messages, instant messaging (IM) and internet based correspondence. Individuals involved in illicit commercial sex will use multiple cellphones, tablets, notebook computers, and phone numbers in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic mail messages with co-conspirators and clients, as well as telephone books containing contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize digital cameras,

cellular telephones, desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, DVD ROMS, pagers, money chips, thumb drives, flash drives, and portable hard drives;

g.      Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find clients and prostitutes. They use Facebook messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, including contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other co-conspirators for the purpose of electronic advertising and promotion of prostitution.

9.      Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "g" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts including email accounts, which can be accessed on computers and cellular telephones.

## **FACTS SUPPORTING PROBABLE CAUSE**

*Initial Lead-JF1*

10.      On November 16, 2020, The National Center for Missing and Exploited Children (NCMEC) contacted HSI with information related to a fourteen-year-old juvenile female (JF1) with an active online commercial sex advertisement located in San Diego, California.  NCMEC conveyed that on August 25, 2020, JF1 was reported as a runaway by Los Angeles County Officials, and that between August and November 2020, NCMEC had identified multiple commercial sex advertisements on various internet-based websites with the purported minor's image, in Los Angeles, San Bernardino and San Diego.

11.     On November 16, 2020, HSI SAs working with task force officers (TFO) at the SDHTTF located an active commercial sex advertisement in San Diego for JF1 on MegaPersonals.eu[1].  The advertisement was associated to phone number xxx-xxx-4413 (later identified as belonging to JF1, *see* paragraph 16).  Photographs contained in the advertisement depicted two young black females in lingerie posing in a hotel room.

12.     Based on the layout of the hotel room in the photograph, TFOs assigned to the SDHTTF identified the hotel as the Quality Inn located at 710 E Street Chula Vista, California.  At approximately 4:00 pm on November 16, 2020, TFOs responded to the location to set up surveillance in an attempt to locate JF1.

13.     At approximately 5:45 pm, TFOs, along with detectives from the Chula Vista Police Department (CVPD), observed two females matching the description of the young black females, JF1 and an adult female (AF1) from the online advertisement leave the hotel and walk to an adjacent liquor store, a Wendy's restaurant, and a Yum Yum Donut shop, before returning to the hotel at approximately 6:20 pm.  TFOs and CVPD detectives continued surveillance on the hotel until additional members from the SDHTTF arrived.

14.     At approximately 7:10 pm, an undercover officer (UC) from the SDHTTF, posing as a "john,"[2] contacted the number from the megapersonals advertisement, xxx-xxx-4413.  UC and JF1 verbally negotiated a "blowjob" (oral copulation) from both JF1 and AF1 for $200.  After the phone conversation, JF1 texted UC the address of the hotel, and then some time after, to provide UC with the room number, Room 129.

15.     At approximately 7:40 pm, UC knocked on the door to room 129 of the hotel, the door opened, and the UC entered closely followed by the UC cover team, who quickly secured the scene.  SAs and TFOs identified JF1 and AF1 and documented the room via photographs, including paraphernalia that in my training and experience I know is commonly associated with prostitution, such as condoms and lotion.  Both JF1 and AF1 were wearing sexually revealing clothing.

---

[1] A dating website that is frequently used to solicit prostitution.
[2] Slang term for a commercial sex buyer.

16.   TFO C. Franco located three cell phones; a red iPhone, a black Android with a cracked screen and another Android with a glitter case, inside the hotel room and seized them as evidence.  UC placed a post-arrest call to xxx-xxx-4413 and the Android with a glitter case belonging to JF1 rang.

17.   SAs and TFOs briefly spoke with JF1 and AF1 and they admitted to working as prostitutes but denied having a pimp.  Both girls claimed that they were "renegade"[3].  Both JF1 and AF1 presented California Identification cards that listed their ages as twenty-one years old.  I reviewed the photograph on the identification that JF1 presented and determined that it did not appear to be her.

18.   JF1 began giving non-verbal indications, such as rolling her eyes in the direction of AF1, that she did not want to talk in front of AF1. Both JF1 and AF1 were separated and briefly interviewed.  Once separated from AF1, JF1 admitted that the identification she presented was fake and gave her true age as fourteen.

19.   JF1 and AF1 were transported, separately, to the CVPD for further interviews and processing.  San Diego Child Welfare Services (CWS) responded to the police department to take custody of JF1.

20.   At the police department, I, along with TFO C. Franco, briefly re-interviewed JF1 but she was adamant about not having a pimp and attempted to steer the conversation to a murder that she had witnessed in Los Angeles a few months prior, claiming the person who was murdered was her last pimp "Larry" (no further information).  JF1 denied having a cell phone and stated that none of the three phones recovered from the hotel room belong to her.  JF1 stated that she was tired and began to shut down, and the interview was terminated.

21.   At approximately 9:55 pm, AF1 was read her Miranda Rights, AF1 waived her rights and agreed to speak with me, along with TFO M. Stevens without a lawyer present.  AF1 admitted that both she and JF1 were working for the same pimp, who she identified as Daylan Lamont CAMP aka "Young D."  AF1 stated that CAMP claims to

---

[3] Slang term for a prostitute who does not have a pimp.

have approximately six other girls that he prostitutes, however AF1 does not know all of them. AF1 identified his "bottom girl[4]" as Tashanae Marie SMITH aka "Mocha". AF1 claimed that CAMP and SMITH regularly beat her (AF1) to keep her in line. AF1 stated that CAMP owns various firearms and believes if CAMP knew she (AF1) was speaking to law enforcement that he (CAMP) would not hesitate to kill her.

22.     According to AF1, CAMP introduced JF1 to AF1 shortly after Halloween of 2020. AF1 stated that CAMP purchased two bus tickets for AF1 and JF1 and directed them both to go to San Diego for commercial sex work; they arrived November 15, 2020.  AF1 stated that CAMP purchased the tickets using an assumed name of Artray JONES.

23.     AF1 identified CAMP's phone number as (928) 615-7278[5] (herein referred to as CAMP's Phone) and his Instagram[6] handle as "bigleague_youngd", which she stated had been changed to "getthebag_yd." (Investigators reviewed the publicly available information for those Instagram accounts and confirmed that the individual pictured in the "profile" picture appears to be CAMP.) AF1 identified two of the recovered cell phones, a red iPhone and a black Android with a broken screen, as belonging to her.  AF1 stated that the other phone in the room, an Android with a glitter case, belonged to JF1.  AF1 provided verbal and written consent to search both of her cell phones but stated that the iPhone was not set up yet.

24.     A cursory search of AF1's black Android showed a recent text message conversation between AF1 and the phone number associated to CAMP.  In one message

---

[4] Slang term for a sex-worker who has been with the pimp the longest and often takes on a mid-level controlling role to keep other sex-workers/victims in line.

[5] In addition to being identified as CAMPs phone by AF1, this phone number is the contact number for various commercial sex advertisements for AF1, JF1 and Tashanae SMITH. Moreover, as discussed *infra,* text messages between JF1, on her phone, and this number contain photographs of JF1 with an individual they recognize as CAMP, as well as "selfie" photographs sent from this number to JF1, that appear to be of an individual investigators recognize as CAMP. All communications contained herein referring to CAMP are to the (928) 615-7278 number.

[6] Instagram is a photo and video sharing social networking service.

dated November 16, 2020 (day of arrest) AF1 text CAMP, "On me daddy[7] im finna switch my hairstyle real quick and then I wanna go back to the blade[8]".

25.    Do to the fact that neither AF1 nor JF1 claimed the Android with a glitter case as theirs, it was seized as abandoned property.  A cursory search was conducted, and it became apparent that it was being used by JF1 to communicate with CAMP, as well as sex-buyers.  At this point, the search was terminated until a federal search warrant could be secured.

26.    On February 3, 2021, SAs reviewed a subpoena return from Greyhound Lines, Inc. regarding bus tickets that were purchased for AF1 and JF1.  The subpoena return showed that two tickets were purchased on November 15, 2020 under the name Tationa COOK[9].  The purchaser used a Visa Credit Card ending in -1031.

*Cell Phone Search*

27.    On November 20, 2020, a federal search warrant was obtained, authorizing agents to forensically download and search the cell phone belonging to JF1. In reviewing the results of the cell phone download, SAs identified multiple conversations between JF1 and prospective sex buyers as they negotiated prices for specific sex acts.  JF1 contacted CAMP's phone through an application called TextNow[10] and traditional text messaging and phone call through the cell phone service provider.  SAs were also able to identify photos of JF1 that she sent to CAMP's phone and text message conversations between JF1 and CAMP, whose contact name was saved in JF1s phone as "Daddy".  The following is a text message conversation via TextNow between JF1 and CAMP on November 6, 2020:

    JF1: Ok daddy
    CAMP: Wyd
    JF1: Just payed [sic] for the room
    JF1: Its hot asf
    CAMP: Ok ok

---

[7] Slang term a prostitute will use to refer to her pimp.
[8] Slang term that refers to the area of town where prostitutes solicit sex-buyers.
[9] This was the name on the fake identification that JF1 presented to agents/officers on November 16, 2020.
[10] A free talk and text service in the US that offers free nationwide cellular service supported by ads.

CAMP: Yea way
CAMP: Wyd
CAMP: How much u made so far
JF1: 280 off this date but its tricky rn so I got my trick finna get me a trap room   so I can do my incalls more
CAMP: On god
CAMP: So u got 280! After the room
JF1: Yea
CAMP: Ight
CAMP: I'm b over dere soon
CAMP: I was thinking bout u all night lol
JF1: Ok
JF1: U was lol I was asleep
CAMP: The add been going up or Na
JF1: My head was hurting
JF1: Yea it is
CAMP: On me
CAMP: Wyd. Now
JF1: At the room waiting for this trick
CAMP: Cool
JF1: I miss my daddy
CAMP: Lol FORREAL
CAMP: I was tryna see u last night
CAMP: On bloods daddy was fieining [sic] for his bitch
JF1: Yo bitch yo head was hurting I needed u lmao I was sleep
CAMP: Ok babyb
CAMP: Wyd
JF1: Wanna go out side but ion know
JF1: I be hating when sum telling me not to
CAMP: Lol
CAMP: Go test it till like 1 baby catch one or 2 dates and go back in
JF1: Ok daddy
CAMP: Yup
CAMP: When u get done call me u got 280
CAMP: Wyd
JF1: Finna go back out side
JF1: Ok
CAMP: Yea
CAMP: U never went
CAMP: I was bout to come pull up on u
JF1: Nah i did
CAMP: O ok u made some money
JF1: My date outside thats why
JF1: Imma text u when i get back
CAMP: O ok
CAMP: Call me
CAMP: Text me when u get back
CAMP Damn we said the same shit
JF1: Ok daddy
CAMP: Ok mommas love u baby hoe safe

JF1: Daddy the police just stoped [sic] me and my trick well tried to but the trick kept going like when I was getting out they stoped us but they aint see me get out they knew a girl was in there though smh

CAMP: Yea wya

CAMP: Just duck off for a couple hours

CAMP: Until like 5

JF1: I just got p

JF1: I just got a hotel

JF1: Hourly

JF1: I wonder why they trippin so hard

CAMP: Damn they tripping like dat

CAMP: DAss brazy

JF1: Shit werid [sic]

CAMP: We gone let it cool off

JF1: But ik what imma do

CAMP: Keep moving around u know

CAMP: Tomarrow [sic] we gone relocate

JF1: Ok daddy

CAMP: Yup new face some were [sic] else

JF1: Chocolate bitch "heart image" at that!

CAMP: Fire

CAMP: Wya

JF1: The room daddy

CAMP: Wyd

JF1: Textin my trick

CAMP: On my way!

JF1: Ok

JF1: My date coming to

CAMP: Ok

CAMP: Ok I'm still come ok

CAMP: Mommas

JF1: Ok daddy

JF1: I wanna do what we did the first night

CAMP: Lol u wanna thug it out

JF1: Yes

JF1: Always gone go hard

JF1: That's why I love my daddy pimpin

JF1 begins the conversation by informing CAMP that she (JF1) just paid for a hotel room.  CAMP then inquires how much money she (JF1) has made so far and JF1 explains that she has made $280.00 but she had her sex-buyer, "trick[11]", get a, "trap room[12]" so she can do her "incalls[13]" there to arrange additional commercial sex dates.

---

[11] Slang term for sex buyer.

[12] Slang term that refers to a hotel room or drop house used for prostitution.

[13] Related to commercial sex where a sex-buyer responds to a specific hotel or address where the sex-worker is located.

Midway through this conversation CAMP refers to JF1 as "baby hoe[14]" which suggests that he (CAMP) knows JF1 is very young.  JF1 ends this conversation by telling CAMP that she (JF1) has another sex-buyer lined up but that she wants to see him (CAMP) later.

28.     The following is a text message conversation between JF1 and CAMP on November 15, 2020 and November 16, 2020, when JF1 and AF1 were sent to San Diego by CAMP for commercial sex work:

CAMP: Aye u got a date
CAMP: Get up 160 outcall
CAMP: Hey
JF1: U know yo hoes had to make a way
CAMP: Way
JF1: Getting some food
CAMP: Y'all got room
JF1: Yup
CAMP: The blade is by Main Street hotel
JF1: K
CAMP: I had my phone down just got up
JF1: I thought we was gone fix that?
CAMP: Fix what
JF1: U sleep and not answering
CAMP: Baby on PDL u seen me turnt for 2 days don't do dat
JF1: Nah u right daddy
CAMP: Thank u
CAMP: I approacoate [sic] it
JF1: On bloods my belly hurt
CAMP: Why
JF1: Like a water cramp
JF1: Or sum
CAMP: O ok
CAMP: But y'all know da blade over early
CAMP: So y'all get out and get going how long y'all got dere
JF1: We going to eat get dressed and then get down
CAMP: Omm
JF1: Period
JF1: How do we get here we made our ways
JF1: Did
CAMP: I'm urber [sic] u right by Main Street hotel
JF1: To blade?
CAMP: U can play the back street or u can walk the main.  Street was is called Main Street
JF1: Ok
CAMP: U take the trick back and fourth [sic] the blade is 5 min from room
JF1: Ok daddy

---

[14] Reference to a very young prostitute.

CAMP: That's the back right we're balbergia the Main Street is main and wooden which is a corner by the gas station
JF1: Ok
CAMP: Wyd
CAMP: Aye download urber [sic]
JF1: K
CAMP: [redacted]-1031
CAMP: That's the card number
CAMP: 06/25 exp date
CAMP: Last 3 856 text me when it's done
CAMP: Did u do it
JF1: It wont let me
CAMP: I got it
CAMP: Don't trip
CAMP: Wyd
CAMP: Try lift
CAMP: Any body hit the ad
CAMP:https://www.lyft.com/sr/1474223857156446522?token=KSikWk_lWbFnhtbxmvf0I
CAMP: See where my Lyft ride is

29.    CAMP started the conversation by informing JF1 that she had a date for a commercial sex act, $160.00 "outcall[15]".  CAMP then informed JF1 where "the blade" is located in Chula Vista/National City.  JF1 explained to CAMP that she did not feel good and was experiencing cramps.  CAMP responded by telling JF1 and AF1 to get to the blade and they can take the "trick" back to the hotel room.  CAMP then instructed JF1 to use Uber or Lyft for transportation and texted his credit card number to use as payment, which is the same credit card that was used to purchase the Greyhound bus tickets (see paragraph 26).  During their conversation, CAMP also texted JF1 a screen shot of a map highlighting the blade near Main Street in Chula Vista, California.

30.    JF1's cell phone revealed communications between JF1 and CAMP starting on November 4, 2020.  On November 11, 2020, CAMP texted JF1 three photos; two photos of a handgun he appeared to be in possession of and one photo of himself with his shirt off.  There is also a photo from November 14, 2020, that appears to have been taken by JF1, of JF1 and CAMP together in what appears to be a hotel room.

[15] Related to commercial sex where a sex-worker responds to a specific hotel or address where sex-buyer is located.

31.     On February 12, 2021, SAs reviewed the cell phone download from AF1's phone, obtained pursuant to her consent.  During that review, SAs identified two text message conversations; one from CAMP's phone, and the other from (763) 442-4375[16] (herein referred to as SMITH's phone).  The following is an excerpt from a text message conversation between CAMP and AF1 from October 24, 2020 through November 16, 2020:

**10/24/2020**

CAMP: I b dere right now
AF1: I'm on the corner by the liquor store
CAMP: Ok catch a date b4 u go
CAMP: I'm bout to get some to eat and come
AF1: I'm so fucking irtiated I'm not making no money out here I really just got in trick car and I took stupid ass $40 and hopped right out tf
CAMP: Ok lol
AF1: I'm not doing shit for 40
CAMP: That's the star lol on god

**10/27/2020**

CAMP: Hello
CAMP: Times up
CAMP: U staying extra
AF1: Yeah ik I'm finishing updated
AF1: Finishing up
CAMP: Get more time if u can
CAMP: But if not
CAMP: Times up

**11/16/2020**

CAMP: U hood
AF1: Thanks
AF1: I mean Yea
AF1: You know this phone be tripping
CAMP: Ight baby we gone get u another one way to step up
CAMP: Keep it going
AF1: Period daddy I got you on me
CAMP: Wyd
AF1: Ready
CAMP: At
CAMP: way
AF1: Donut shop down the street
AF1: Send uber to room please
CAMP: Hello

---

[16] (763) 442-4375 is the contact number for multiple commercial sex-ads for "Mocha" (see paragraph 21) located on Megapersonals.eu.  Mocha's profile on Megapersonals.eu, as well as her sex ads show multiple images of a female. Investigators compared those images to the California Identification issued to Tashanae SMITH, and it appears to be the same person. In addition, AF1 identified this number as belonging to SMITH in her interview.

AF1: On me daddy im finna switch my hairstyle real quick and then I wanna go back to the blade
AF1: I can't just be sitting around I just came back from walking down Broadway
CAMP: Ok u bout to switch it
AF1: Yeah a slick ponytail
CAMP: Hey now
AF1: Cool
AF1: In Uber

32.   Also recovered from the consent download of AF1's cellular phone was portion of AF1's Instagram account. That included a conversation that she (AF1) had via Instagram with an individual using the handle Bigleague_youngd, previously identified as CAMP (*see* paragraph 23). The following is an excerpt from the conversation between AF1 and CAMP on November 15, 2020 and November 16, 2020, the time both AF1 and JF1 were in San Diego:

Bigleague_youngd: Ok cool
AF1: The quality inn Chula Vista San Diego
AF1: On e street
AF1: 1 602-583-9699
AF1: Can you please post the ad when you get the chance daddy im about to get in the shower and get to it
AF1: I really don't wanna go inside I was gon say if I could walk up to national
Bigleague_youngd: What happened

33.   On October 24, 2020, CAMP started a conversation with AF1 instructing her to complete a commercial sex date before she left the area ("catch a date b4 u go"). AF1 responded to CAMP that a prospective sex-buyer only offered her $40.00 so she took the money and left without committing the sex act. On October 27, 2020, CAMP instructed AF1 to hurry up unless she can get more time. AF1 responded that she was finishing up. In my training and experience, I believe that this conversation is referring to a commercial sex encounter that was taking additional time. On November 16, 2020, CAMP and AF1 had a conversation over text message and one through Instagram. CAMP started the text conversation asking for AF1's location. She responded that she was at a donut shop and asked CAMP to send an Uber to the hotel room. AF1 informed CAMP that she was going to change her hair style then go back to the "blade" to solicit sex. During the conversation AF1 refers to CAMP as

"daddy".  During their Instagram conversation, AF1 informs CAMP of their location, the Quality Inn in Chula Vista.  AF1 then asked CAMP to post the ad when he had an opportunity.  In my training and experience, I believe that AF1 was referring to the commercial sex ad that ultimately led to AF1's and JF1's law enforcement contact on November 16, 2020.

34.     In AF1's cell phone, investigators also identified conversations between AF1 and SMITHs phone.  The following conversation is an excerpt from their conversation on October 25, 2020.  AF1 has SMITH's contact info saved as "Wifey 304"[17]:

> Wifey 304: You ok
> AF1: Yeah
> Wifey 304: Wya
> AF1: On 111[th]
> AF1: Wya
> Wifey 304: Getting picked up
> AF1: Oh okay
> Wifey 304: K
> Wifey 304: Bout to pull up way
> AF1: Still on 111th
> Wifey 304: Pulling up
> AF1: K
> AF1: Wifey by ass hurt so bad
> Wifey 304: Why
> AF1: Girl nasty ass anal like ew
> Wifey 304: What happen???
> Wifey 304: Did you take it up the ass
> AF1: Mf rammed his shit in their
> AF1: Yeah
> Wifey 304: Wow wtf when?
> Wifey 304: After I just went on this play?
> AF1: Nah my first date
> AF1: And it's still hurting like damn
> Wifey 304: You gotta kno how to take control over every situation. Never let a mf do you any kind of way, unless he paying.
> Wifey 304: I got you when we go in
> Wifey 304: You might have to remind me
> AF1: Ong you right I gotta learn how to be more assertive and stand my ground

---

[17] Wifey is a slang term prostitutes use for other prostitutes that are under the same pimp and 304 is a slang term used for a prostitute in general.

35.     In their conversation, AF1 complained to SMITH that she was in pain because a recent sex buyer performed anal sex on her without her consent.   SMITH responded by telling AF1 that she needed to be in control of the situation and added that sex buyers can only do what they pay for.

*Commercial Sex Ads*

36.     Using law enforcement databases, SAs located the original commercial sex advertisement, as well as, other commercial sex advertisements linked to AF1, JF1, CAMP and SMITH. The Megapersonals.eu commercial sex ad dated November 15, 2020, depicted both JF1 and AF1 in sexually suggestive poses. It was titled "PNP New in Town Hothorny [sic] Tight and Ready Slim Chochlate [sic] Deep Throat You Baby". The contact number for the advertisement was xxx-xxx-4413, the cell phone belonging to JF1 on November 16, 2020.     This same advertisement was posted to Megapersonals.eu in Inland Empire, California on the same date but the contact number was CAMP's phone.

37.     SAs identified additional commercial sex advertisements for JF1, with CAMP's phone number as the contact number.  On November 12, 2020, a commercial sex advertisement was posted to Megapersonals.eu with photos depicting JF1 and AF1 that included CAMP's phone number. It was reposted on November 14, 2020 and November 15, 2020 with the title "PNP New in Town Hothorny [sic] Tight and Ready Slim Chochlate [sic] Deep Throat You Baby".  On November 8, 2020, a commercial sex advertisement was posted to Megapersonals.eu depicting JF1 alone in sexually suggestive poses. The advertisement listed the contact number as JF1's phone and was titled "Hey Babe Its Ya Girl Nasty New in Town Ready for Fun PNP Anal Ready Fettish [sic] Friendly".  All of these commercial sex advertisements are associated to the same Megapersonals.eu screenname "Mocha" (which belongs to SMITH, *see* footnote 16).

38.     SAs researched law enforcement databases for the Megapersonals.eu account belonging to "Mocha", which is believed to be SMITH.  Additional commercial sex ads depicting SMITH, under the screenname Mocha, list various contact phone

numbers to include SMITH's phone, the same number that SMITH was using while texting AF1 on October 25, 2020 (*see* paragraph 34). SAs also located commercial sex ads with SMITH's number that depict images of SMITH and AF1 in sexually suggestive poses under the titles, "Mocha new in town horny rigght [sic] and tight special", "hey baby its mocha trucker friendly pnp friendly outcalls ready" and "new in town hot new ebony in town FUN GIRL Upscale call girl, pnp, strap play fetish friendly, 2 girl fun".

<u>CAMP's Arrest on State Charges</u>

39.     On March 20, 2021, Riverside Police Department (RPD) responded to a domestic violence call at the Estancia Apartments located at 7871 Mission Grove Pkwy. S. Riverside, CA unit #189. SMITH's mother called the police and reported that CAMP had struck SMITH with an assault rifle (reference RPD report number 210008083-001). When officers arrived at the apartment they called out the occupants. SMITH came out first, followed by CAMP carrying his young daughter. Based on the initial call from SMITH's mother and the fact that CAMP was on parole, officers conducted a parole sweep of the apartment and located a .45 caliber handgun, ammunition, and a body armor vest. CAMP was arrested for two felony warrants, felon in possession of a firearm and felon in possession of body armor. At the time of arrest CAMP was in possession of a blue iPhone with a black case that RPD took possession of.

<u>The Subject Account</u>

40.     On April 13, 2021, CAMP's Phone was seized from the Riverside County Southwest Detention Center located in Murrieta, California. On April 16, 2021, a warrant was authorized by the Honorable Allison H. Goddard to search the contents of CAMP's phone. (21-MJ-1447.)

41.     On April 26, 2021, CAMP's Phone was downloaded pursuant to that warrant at the Customs and Border Protection (CBP) Joint California Forensics Lab, which revealed the following: Model: iPhone 12; Serial Number: G6TF2HL40DXT; Unique Device Identifier (UDID) 00008101-0004543E1143003A; Phone Number: (928) 615-7278; Apple ID: gohardmafia@icloud.com; and Gmail Account:

cxxxddd89@gmail.com. Likely due to the phone running out of battery while in RPD custody, and then being charged and plugged in for extraction, only a limited amount of data was recovered from the phone. Given the association of the phone with an apple ID, however, I believe that the Subject Account contains likely backups of the data that could not otherwise be recovered from the phone itself. I know based on my training and experience that iCloud backups include, but are not limited to, text messages, iMessages, facebook messages, instagram messages, and other text messaging services (such as WhatsApp or TextNow) messages.

42.     Based upon my experience and training, consultation with other law enforcement officers experienced in sex trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the illicit activities of CAMP and his co-conspirators, such as telephone numbers; call history; contacts; electronic mail (email) addresses; notes; photographs; messages over WhatsApp, iMessage, Facebook, Instagram, and possibly TextNow and TextMe; photographs; and other digital information are likely stored on the **Subject Account** described herein. Given what agents know about CAMP's involvement in sex trafficking, as detailed above, I respectfully request permission to examine the **Subject Account** for data responsive to Attachment B for the period of **November 1, 2020 to March 21, 2021**.

43.     Based on my training and experience investigating sex trafficking and in talking to other more experienced investigators, I believe that a search of an iCloud account can reveal evidence:

a.      tending to identify attempts to arrange commercial sex dates, attempts to transport sex workers to and from dates and launder sex trafficking proceeds;

b.      tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate sex trafficking, the transportation or laundering of sex trafficking proceeds;

c.      tending to identify co-conspirators, criminal associates, or others involved in sex trafficking, those involved in transporting or laundering sex trafficking proceeds;

d.      tending to identify travel to or presence at locations involved in sex trafficking, transporting or laundering sex trafficking proceeds;

e.      tending to identify the user of, or persons with control over or access to, the subject account; and/or

f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**INFORMATION REGARDING APPLE ID AND iCLOUD**[18]

44.      Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

45.      Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

---

[18]      The information in this section is based on information published by Apple, Inc. on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "iCloud: iCloud storage and backup overview," available at https://support.apple.com/kb/PH12519; and "iOS Security," available at http://images.apple.com/privacy/docs/iOS_Security_Guide.pdf.

c.      iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices.  iWorks Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.

g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.      App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and

television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

46. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

47. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

48. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

49. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs

with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

50.    Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

51.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be

used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.

52.   As described above, this sex trafficking investigation involves the use of cellular telephones to coordinate sex trafficking and its proceeds throughout the Counties of Los Angeles, Riverside and San Diego.  Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in sex trafficking and money laundering investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.   Sex traffickers will use cellular/mobile telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages.

b.   Sex traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their sex workers while they are working.

c.   Sex traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their sex workers/ sex buyers will arrive at predetermined locations.

d.   Sex traffickers will use cellular/mobile telephones to notify or warn their accomplices and sex workers of law enforcement activity to include the presence and posture of marked and unmarked units.

e.   Sex traffickers and their co-conspirators often use cellular/mobile telephones to communicate with drivers who transport their sex workers and/or commercial sex proceeds.

53.   In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above,

may be found in the files and records of the **Subject Account**. Likewise, this cellphone evidence, including iMessages, Facebook messages, Instagram, and WhatsApp messages backed up to **Subject Account**, may be used to establish the "who, what, why, when, where, and how" of the investigation into the conspiracy of commercial sex trafficking of a minor, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

54.    For example, in this case, the stored iMessages, Instagram messages, WhatsApp messages, and Facebook messages, and contacts connected to the **Subject Account** may provide direct communications between CAMP and his co-conspirators. It also may be used to help identify known co-conspirators of whom we only have their moniker identified. Additionally, I believe that there is probable cause to believe that photographs and videos may be present on the **Subject Account** which provide additional evidence of the conspiracy, such as photos or videos of co-conspirators or locations frequented by the conspirators in furtherance of their illicit activities. Moreover, there may be voicemails, emails, or notes (such as ledgers), which are created in furtherance of the criminal activity.

55.    Activity over the **Subject Account** may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

56.    Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  For example, agents are especially interested in CAMP's use of Facebook messenger, Instagram, WhatsApp and TextNow as CAMP is known to use these applications to facilitate his

criminal activity. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

57.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the sex trafficking conspiracy involving CAMP, including information that can be used to identify the account's user.

## INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

58.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B, incorporated herein.  Upon receipt of the information described in Section I of Attachment B, HSI Agents will review that information to locate the items described in Section II of Attachment B, incorporated herein.

## REQUEST FOR SEALING AND PRECLUSION OF NOTICE

59.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.  In addition, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of this warrant, other than its personnel essential to compliance with the execution of this warrant, until October 27, 2021, absent further order of the court.

## **JURISDICTION**

60.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **CONCLUSION**

61.     Based on the forgoing, I request that the Court issue the proposed search warrant for **Subject Account,** as described in Attachment A, incorporated herein, for evidence related to the crime of sex trafficking of a minor, as outlined in Attachment B, incorporated herein.

Aron C. Marcellus

Special Agent

Homeland Security Investigations

Sworn and attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1, this 30 day of April 2021.

The Honorable Barbara L. Major

United States Magistrate Judge

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to data and information associated with Apple, Inc. iCloud account(s) connected to **gohardmafia@icloud.com** and/or **cxxxddd89@gmail.com** (hereinafter the "**Subject Account**") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., an electronic communication service provider headquartered at Apple Inc., 1 Apple Park Way, Cupertino, CA 95014.

## ATTACHMENT B

### Particular Items to be Seized

### I.    Information to be disclosed by Apple

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, including any messages, media, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.    All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"),

Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.     The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.     The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages, as well as messages from third party applications including Facebook, Instagram, and WhatsApp) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each

instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.     The contents of all files and other records, including audio/video media, stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWorks (including Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.     All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), messaging logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find my iPhone logs, logs associated with iOS device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers);

g.     All records and information regarding locations where the account was accessed, including all data stored in connection with Location Services;

h.      All records pertaining to the types of service used; and

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code, Section 1591, for the time period of November 1, 2020 to March 21, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters which constitutes evidence:

a.      tending to identify attempts to facilitate sex trafficking, attempts to transport and launder sex trafficking proceeds;

b.      tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate sex trafficking, the transportation or laundering of sex trafficking proceeds;

c.      tending to identify co-conspirators, criminal associates, or others involved in sex trafficking, those involved in transporting or laundering sex trafficking proceeds;

d.      tending to identify travel to or presence at locations involved in sex trafficking, transporting or laundering sex trafficking proceeds;

e.      tending to identify the user of, or persons with control over or access to, the subject account; and/or

f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.